# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 10-00184-01-CR-W-DGK |
| Shane R. Hocking, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE AND STATEMENTS WITH SUGGESTIONS (Doc. #12) filed on November 5, 2010, by defendant Shane R. Hocking ("Hocking"). On January 19, 2011, the undersigned held an evidentiary hearing on Hocking's motion. Hocking was present and represented by his counsel, Federal Public Defender Stephen C. Moss. The government was represented by Assistant United States Attorney Michael Green. At the evidentiary hearing, the government called two witnesses, Trooper Roger Rudstrom and Corporal Christopher Blackmon, both with the Missouri Highway Patrol. No exhibits were admitted into evidence at the hearing.

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT

1. On April 17, 2010, Roger Rudstrom was working as an on-the-road Trooper with the Missouri Highway Patrol. Tr. at 4-5.

2. On that date, Trooper Rudstrom was patrolling in a trooper vehicle accompanied by Corporal Christopher Blackmon, also with the Missouri Highway Patrol, who was acting as a field training officer. Tr. at 5, 18, 43-44, 54.[1]

3. While patrolling on the evening of April 17, 2010, in eastern Jackson County, Missouri, eastbound on U.S. Highway 40, Trooper Rudstrom observed a black Mitsubishi that was missing a front license plate make an improper lane change onto Adams Dairy Parkway. Tr. at 6, 18-19, 45-46.

4. Trooper Rudstrom thereafter activated his lights and siren. Tr. at 6.

5. The black Mitsubishi pulled over near an apartment complex. Tr. at 6-7.

6. A radio call by Trooper Rodstrom to his communications division disclosed that the license plate on the black Mitsubishi was registered to an Infinity passenger car. Tr. at 46.

7. Trooper Rudstrom then approached the vehicle and noted that a man was driving the vehicle and that there was also a dog in the vehicle. Tr. at 7, 47.

8. Trooper Rudstrom asked the driver for identification and proof of insurance. Tr. at 7.

9. The driver was not able to produce any proof of insurance, but based on the documentation presented, Trooper Rudstrom identified the driver as Hocking. Tr. at 8, 23-24.

10. Trooper Rudstrom then asked Hocking to exit his vehicle and get into the trooper vehicle on the passenger side in the front seat. Tr. at 8-9, 27, 48.

11. Corporal Blackmon sat in the back seat of the trooper vehicle. Tr. at 49, 58.

12. Trooper Rudstrom and Corporal Blackmon noted that Hocking had open wounds on his face and arms. Tr. at 8, 20-21, 28, 49.

---

[1] On April 17, 2010, Trooper Rodstrom was in the "shadow" phase of his training so that Corporal Blackmon was merely observing the actions while Trooper Rodstrom was expected to proceed as if he was the only officer on the scene.

2

13. Based on his training to that point, Trooper Rudstrom knew that open wounds on the body were often associated with the use of illegal drugs including crack cocaine and methamphetamine. Tr. at 9, 20-23.

14. Trooper Rudstrom asked Hocking about the wounds and Hocking told him that he had taken oxycontin and was having an allergic reaction to it. Tr. at 9, 22, 28, 59.

15. Trooper Rudstrom then asked Hocking if he would consent to a search of the black Mitsubishi and Hocking said "Sure, I don't really care, man." Tr. at 10, 24, 28, 50, 61.

16. At that point, Hocking was not handcuffed. Tr. at 10, 50.

17. Neither Trooper Rudstrom nor Corporal Blackmon were pointing a weapon at Hocking. Tr. at 10, 50.

18. Hocking did not appear to be under the influence of any drugs or impaired in any way. Tr. at 25, 60.

19. After asking Hocking about searching the black Mitsubishi, Trooper Rodstrom asked Hocking to get out of the trooper vehicle and retrieve the dog in the car. Tr. at 11, 51.

20. After Hocking got the dog, Trooper Rodstrom then had Hocking and the dog wait on an outdoor bench near where the traffic stop was taking place. Tr. at 11, 29-30, 51, 63.

21. Trooper Rodstrom then searched the black Mitsubishi and found what appeared to be a crack pipe, a scale and five plastic bags in the front seat area of the car. Tr. at 12, 33-35, 52.

22. Trooper Rodstrom then walked over to the bench where Hocking was sitting with his dog and asked him if he had any additional contraband or illegal things in his car. Tr. at 12, 36, 52.

23. Hocking then informed Trooper Rodstrom that he had a weapon in the back seat in a laundry basket. Tr. at 13, 36, 52.

24. Trooper Rodstrom then handcuffed Hocking and told him that we was not under arrest, but was being handcuffed for officer safety. Tr. at 32-33, 52-53, 67.

25. Trooper Rodstrom then searched a laundry basket in the back seat of the black Mitsubishi and found a loaded Glock 26 and six 50-round 9 mm. boxes of ammunition underneath folded clothes in the basket. Tr. at 13-14, 37, 53.

26. Trooper Rodstrom then looked in the trunk of the black Mitsubishi and found additional ammunition. Tr. at 14-15.

27. After Trooper Rodstrom completed searching the vehicle and seizing the contraband, he issued two citations to Hocking – one for lack of proof of insurance and one for possession of drug paraphernalia – and allowed Hocking to leave. Tr. at 15, 38.

28. The entire encounter lasted approximately one hour. Tr. at 16.

29. Prior to April 17, 2010, Hocking had previously been arrested by law enforcement officers. Tr. at 72.

## PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Hocking raises two principle arguments, to wit: (1) the warrantless search of the black Mitsubishi violated the Fourth Amendment, and (2) the questioning of Hocking at the scene of the search violated the Fifth Amendment. As explained below, the Court rejects both arguments.

The Fourth Amendment, of course, provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, the Constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891). In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized.

The rights protected by the Fourth Amendment are implicated in this case by Trooper Rudstrom's decision to stop Hocking's vehicle on April 17, 2010. For obvious reasons, however, Hocking does not contest the validity of this initial traffic stop inasmuch as Trooper Rudstrom had observed Hocking violate traffic laws prior to the stop. *Compare United States v. Coleman*, 603 F.3d 496, 499 (8th Cir. 2010) (a traffic stop is lawful when an officer observes a traffic violation, even a "minor infraction"); *United States v. Ehrmann*, 421 F.3d 774, 780 (8th Cir. 2005) ("A traffic violation, no matter how minor, creates probable cause for a law enforcement officer to stop the vehicle"). Nor, in this case, does Hocking raise any constitutional issues with Trooper Rudstrom's conduct prior to the search of the black Mitsubishi – asking Hocking for identifying information and asking about his plainly visible open wounds. *See*, *.e.g.*, *United States v. Alegree*, 175 F.3d 648, 650 (8th Cir. 1999) (any justifiable traffic stop "may include asking for the driver's license and registration, asking the driver to sit in the patrol car, and asking about the driver's destination and purpose"). Hocking, though, does contend that Trooper Rudstrom violated the Fourth Amendment when he searched black Mitsubishi.

Obviously a warrantless search of a vehicle by law enforcement raises serious constitutional implications. But again, the Fourth Amendment only prohibits unreasonable searches – even of an individual's vehicle. To that end, it is established law that consent to search is an exception to the warrant requirement of the Fourth Amendment. *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801 (1991). When, as in this case, searches conducted pursuant to alleged consent are subsequently challenged by a defendant, the touchstone in analyzing a motion to suppress is whether the consent was voluntary.

In broad strokes, consent to search is voluntary if it is "the product of an essentially free and unconstrained choice by its maker . . . rather than a product of duress or coercion, express or

implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047-48 (1973). To assist a court in making this ultimate determination, numerous factors relating to the person giving the consent and the environment surrounding the consent have been articulated. For instance, with regard to a defendant who consents, courts consider:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his *Miranda* rights prior to consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

*United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001). With regard to the environment surrounding a consent, courts will examine whether the person who consented:

> (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police; (3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or secluded place; or (6) either objected to the search or stood by silently while the search occurred.

*United States v. Mancias*, 350 F.3d 800, 805 (8th Cir. 2003).

In this case, and after making credibility findings of the testimony given at the evidentiary hearing, the Court concludes that Hocking voluntarily consented to the search of the black Mitsubishi. Hocking was an adult at the time of the incident who appeared to have basic general intelligence and the ability to comprehend what was being said to him (*e.g.*, his explanation of an allergic reaction to oxycontin when asked about his open sores). Hocking did not appear to the officers to be (then) under the influence of drugs and Hocking had previous experience in dealing with law enforcement officers. There was no evidence that Hocking was threatened or received any improper promises. Finally, Hocking never objected to the search of

6

the black Mitsubishi even though he was only a short distance away on a public bench watching the search progress. Consequently, the Court concludes that there was no constitutional violation in Trooper Rudstrom's initial search of the vehicle – a search that yielded drug paraphernalia in the front seat.

After finding the drug contraband, Trooper Rudstrom then walked over to public bench where Hocking was sitting and asked him if there was additional contraband in the car. Hocking contends that this questioning violated the Constitution. To that end, the Fifth Amendment commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying voluntarily in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*U.S. v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. U.S.*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

In this instance, Hocking was not apprised on his *Miranda* rights prior to responding to Trooper Rudstrom's inquiry. However, as noted, *Miranda* itself is only triggered by custodial interrogation. The government argues that Hocking was not in custody at the time he was asked about other contraband in the vehicle.

The ultimate question in determining whether a person is in "custody" for purposes of *Miranda* is "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520 (1983). Moreover, the "only relevant inquiry" in considering that question is how a

8

reasonable person in Hocking's position would have understood his situation. *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 3151 (1984).[2] *See also Yarborough v. Alvarado*, 541 U.S. 652, 660-65, 124 S.Ct. 2140, 2147-50 (2004). In making that evaluation, the Court must consider the totality of the circumstances that confronted Hocking at the time of questioning. *United States v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002).

To ascertain whether a defendant can be deemed to have been in custody, the Eighth Circuit has developed a non-exhaustive list of six "coercive factors" to be considered by a court:

> (1) whether the suspect was informed during the interview that the questioning was voluntary, that he could ask the officers to leave, or that he was not considered under arrest;
>
> (2) whether the suspect possessed unrestrained freedom of movement during questioning;
>
> (3) whether the suspect voluntarily acquiesced to official questioning or initiated contact with authorities;
>
> (4) whether strong arm tactics or deceptive stratagems were employed during questioning;
>
> (5) whether there was a police-dominated atmosphere; and
>
> (6) whether the suspect was placed under arrest at the termination of the questioning.

*United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990). Reviewing the totality of the circumstances as demonstrated by the testimony presented at the hearing, the Court concludes

---

[2] Consequently, Corporal Blackmon's testimony that he would not have allowed Hocking to leave the scene [Tr. 63] is not outcome-determinative. Corporal Blackmon (who was merely shadowing Trooper Rudstrom) did not communicate his belief to Hocking nor was he near enough to Hocking to lead a reasonable person in Hocking's position to believe that Corporal Blackmon would intercede and prevent Hocking from leaving.

that the *Griffin* factors do not support a finding that Hocking was in custody when Trooper Rudstrom asked him if there was additional contraband in the black Mitsubishi.

Although Hocking was not specifically told that he was not under arrest, Trooper Rudstrom did not insinuate that Hocking was under arrest either. Hocking was unrestrained, he was allowed to retrieve his dog from the vehicle, and was sitting on a bench out in the public. Neither officer at the scene was in particularly close proximity to Hocking for the majority of the time that he was on the public bench. *Compare United States v. Martin*, 369 F.3d 1046, 1057 (8th Cir. 2004) (suspect not in custody because "the atmosphere of the interview was not police-dominated [in that] two agents interviewed [the suspect] in a public place"). Moreover, when asked if there additional contraband in the vehicle, Hocking readily answered and Trooper Rudstrom employed no tricks or strong arm tactics. Finally, Hocking was not immediately arrested after the questioning and was only restrained (*i.e.*, placed in handcuffs) after the weapon was found in the vehicle.[3] Under these facts, the Court does not recommend suppression of Hocking's statement to Trooper Rudstrom.[4]

Accordingly, it is

**RECOMMENDE**D that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS EVIDENCE AND STATEMENTS WITH SUGGESTIONS (Doc. #12) filed on November 5, 2010, by defendant Hocking .

---

[3] The government concedes that any questioning of Hocking at the scene of the traffic stop after he was placed in handcuffs might present *Miranda* issues and the government has stated that it will not any offer statements made by Hocking after he was restrained.

[4] The Court would note that even if the statement were suppressed, the weapon itself would not need to be suppressed inasmuch as it would have inevitably been discovered during the course of the consent search of the black Mitsubishi.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

      */s/ John T. Maughmer*
      **JOHN T. MAUGHMER**
      **U. S. MAGISTRATE JUDGE**